UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KEITH EDWARD
GARDINER #383334,                               Case No. 2:21-cv-00167

        Plaintiff,                          Hon. Paul L. Maloney
                                                U.S. District Judge

    v.

UNKNOWN BEDIENT, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses Defendants' motions for summary judgment.   (ECF Nos. 137 and 140.)

Plaintiff state prisoner Keith Gardiner filed a verified complaint pursuant to 42 U.S.C. § 1983.   (ECF No. 1.)   Gardiner says that his knee locked up in August of 2020, and Defendants refused to provide him with proper medical care in violation of his rights under the Eighth Amendment while he was confined in the Alger Correctional Facility.   (*Id*.)   The remaining Defendants are Registered Nurse (RN) Bedient, RN Bergh, RN Wright, and Physician Assistant (PA) Westcomb.

Gardiner required surgery to repair a torn meniscus. Gardiner alleges that Defendants should have sent him to the hospital when he first presented with an injury so that he could receive magnetic resonance imaging (MRI) and have surgery earlier.   In the opinion of the undersigned, Defendants have established that no

genuine issue of material fact exists, and that they are entitled to summary judgment on Gardiner's claims.    After Gardiner injured his knee, it would occasionally lock up. Gardiner alleges that he was examined by RNs Wright, Bergh, and Bedient.    The RNs provided appropriate medical care by referring Gardiner to a medical provider and instructing Gardiner to take Ibuprofen and to use a cold/warm compress.

Medical provider PA Westcomb examined Gardiner after the referral and provided follow-up care.    Initially she was unable to schedule Gardiner for an x-ray because of the COVID-19 pandemic, but an x-ray was scheduled.    The x-ray was unremarkable.    PA Westcomb's request for an MRI was denied by a reviewing doctor, and she was instructed to provide conservative management care to Gardiner's knee.    PA Westcomb continued to provide an ACE wrap bandage, prescribed nonsteroidal anti-inflammatory drugs (NSAID), instructed Gardiner to perform exercises to strengthen the muscles around his knee, and to avoid activities that cause him knee pain.    After conservative treatment failed to resolve Gardiner's knee issues, PA Westcomb's MRI request was approved.    The MRI revealed a torn meniscus in Gardiner's knee and Gardiner elected surgery to repair his knee.    The surgery was successful.

In the opinion of the undersigned, Gardiner received appropriate treatment from Defendants.    Defendants have established that no genuine issue of material fact exists and that they did not act with deliberate indifference to Gardiner's serious medical needs, entitling them to summary judgment.    Gardiner's assertion that he

should have been treated differently fails to establish an Eighth Amendment violation.

## II.  Facts

### a. Gardiner's Allegations

Gardiner alleges that he was deliberately denied medical care and treatment for over two years.   (ECF No. 146, PageID.1151 (Gardiner affidavit).)   While walking on August 16, 2020, Gardiner's right knee locked in a bent position causing him pain.  (*Id*., PageID.1152.)   While a corrections officer was getting Gardiner a wheelchair to take him to healthcare, Gardiner was able to "unlock" his knee and stand up.  (*Id*.)   Gardiner says he was able to limp and shuffle his way to healthcare.  (*Id*.)   Gardiner says that RN Bedient examined him after he arrived at healthcare.   (*Id*.)   Gardiner says that before his examination, he immediately informed RN Bedient that he needed an x-ray, an MRI, surgery, and a referral to PA Westcomb.  (*Id*., PageID.1153.)

RN Bedient told Gardiner to sit on the exam table and then she stated that it did not look like there was swelling.  (*Id*.)   Gardiner responded by telling RN Bedient that there would be no swelling because the injury was internal.   (*Id*.) Gardiner further explained that this meant that "it is probably ligament or tendon damage."  (*Id*.)   Gardiner says that RN Bedient denied his requests and told him to "just deal with it, now go back to your cell."  (*Id*.)   Gardiner says that he left healthcare without any treatment or medical care.   (*Id*.)

3

A few days later, while he was working outside, Gardiner says that he spoke with RN Bergh.  (*Id.*)   Gardiner says that he told RN Bergh that his knee had locked up again, and that RN Bedient denied him a referral to PA Westcomb. Gardiner says that RN Bergh asked him his name, and then told him that she would set up a referral.  (*Id.*, PageID.1154.)   A week later, Gardiner says that he visited PA Westcomb for a physical examination.   (*Id.*)   During the examination, Gardiner demonstrated that he had free range of motion without complication by doing lunges and squats.  (*Id.*)   According to Gardiner, PA Westcomb diagnosed a muscle pull, gave him daily exercises, and told him he would need an MRI.  (*Id.*)   PA Westcomb allegedly told Gardiner that due to MDOC policy she first needed to schedule him for an x-ray before any advanced tests were ordered.  (*Id.*)   In addition, Gardiner says that he received an ACE bandage.  (*Id.*)

During August and September Gardiner says that his knee continued to lock-up, but he did not seek medical care while he was waiting for his x-ray.  (*Id.*)   At some point in September, Gardiner spoke with PA Westcomb, who informed him that an x-ray technician would not come to the prison due to the COVID-19 pandemic. (*Id.*, PageID.1155.)   When Gardiner told PA Westcomb that his knee was locking up and he was experiencing a tremendous amount of pain, PA Westcomb responded that there was nothing that she could do about it and Gardiner would have to wait.  (*Id.*)

On December 12, 2020, while exercising outside in the yard, Gardiner's leg locked up.  (*Id.*)   Gardiner says that this time he experienced more pain.  (*Id.*) Gardiner was taken by a corrections officer to healthcare in a wheelchair.  (*Id.*)

4

Gardiner says that RNs Bergh and Wright examined his leg from three feet away. (*Id.*, PageID.1156.)   Once again, the RNs said that there was no swelling and Gardiner explained that there would be no swelling because the injury was internal and likely ligament damage.   (*Id.*)   Gardiner says that the RNs told him that there was nothing that they could do because it was late Sunday, and they were going home. (*Id.*)   Further, the RNs told Gardiner to go back to his cell, "fix it himself", and that they would check him on him in the morning.   (*Id.*)   Gardiner says he struggled to return to his cell and that he suffered unnecessary pain as a result.   (*Id.*, PageID.1157.)   Gardiner says that he suffered for three hours in intense pain as he tried to "unlock" his knee while he was in his prison cell.   (*Id.*)   When he finally was able to "unlock" his knee, he heard a "popping sound" and gained relief but he continued to experience pain and throbbing during the night.   (*Id.*, PageID.1158.) The next day, Gardiner says that he was told that he would not see an RN that day. (*Id.*)

On December 14, 2020, Gardiner saw PA Westcomb.   (*Id.*)   According to Gardiner PA Westcomb changed her diagnosis from a pulled muscle to ligament damage and told him he needed an MRI.   (*Id.*)   After PA Westcomb asked Gardiner about his x-ray results, she remembered that she never set up an x-ray for him.   (*Id.*) PA Westcomb told Gardiner that she would now push for an x-ray despite being in COVID lockdown, and that she did not push for one earlier because she thought he only had a non-serious muscle pull.   (*Id.*)   Gardiner says that he went to the hospital in Munising, Michigan the next day for an x-ray.   (*Id.*, PageID.1159.)

Gardiner says that PA Westcomb denied his requests for a bottom bunk accommodation and for Glucosamine supplements.

PA Westcomb then informed Gardiner that his x-rays were negative and that she would request an MRI.  (*Id*.)  When Gardiner spoke with PA Westcomb about three or four weeks later, Westcomb told him he would not receive an MRI and that he would just have to deal with it.  (*Id*.)

A few weeks later, after Gardiner's knee continued to lock up, he saw PA Westcomb again.  (*Id*.)  This time, PA Westcomb diagnosed a "bucket-tear" in Gardiner's knee, and told Gardiner that surgery was his only option. Gardiner wanted surgery, but PA Westcomb told him he would not be approved for surgery without first getting MRI results, but that he was not approved for an MRI.  (*Id*.) Gardiner says that he was "flabbergasted" by PA Westcomb's reason that he was not approved for an MRI.  (*Id*., PageID.1160.)  Gardiner says that PA Westcomb should have pushed for an MRI just as she had previously to get him an x-ray.  (*Id*.)

Finally, Gardiner says he discovered the real reason that he was not getting an MRI when he was examined by RN Gasperich in March of 2021.  (*Id*.)  Gardiner says that RN Gasperich told him several reasons why he was not receiving appropriate medical care and made other revelations: (1) that Corizon Health would not spend money on advanced tests; (2) the nursing staff thought he was faking an injury; (3) RNs Bergh and Wright should have sent him to the hospital initially; (4) RN Gasperich had the exact same injury and surgery was the only was to resolve the pain and repair the tear; and (5) there was nothing that prison health care staff could

do because he needed surgery.   (*Id.*)   Gardiner alleges that RN Gasperich told him that he would have to wait for a new medical provider to take over for Corizon Health before he could be approved for an MRI and surgery.   (*Id.*)

In September of 2022, a new medical provider, Well Path, took over and began approving tests for inmates.   (*Id.*, PageID.1161.)   Gardiner says after he learned this he asked for an appointment with healthcare.   (*Id.*)   At his appointment, PA Westcomb told him she would push for an MRI.   (*Id.*)   Gardiner was approved for an MRI in November of 2022, and had surgery on March 2023, to repair his knee. (*Id.*)   Gardiner says that he should not have had to suffer for two and one-half years before he finally was provided surgery to repair his knee.   (*Id.*)

### b.  Medical Records

Gardiner was examined by a non-party RN on March 9, 2020, when he visited healthcare and requested a knee brace, and an x-ray or MRI because his knee had been popping out of place after he had fallen on ice.   (ECF No. 138-2, PageID.725.) Gardiner was provided with an ACE bandage, Ibuprofen, and referred to a medical provider.   (*Id.*, PageID.726-727.)   The medical provider, a non-party nurse practitioner (NP), examined Gardiner on March 11, 2020.   (*Id.*, PageID.722-724.) Although Gardiner reported that his knee was normal that day, he was concerned that it would pop out again.   The NP recommended that Gardiner stop doing lunges, burpees, and squats, but continue riding the stationary bicycle.   (*Id.*)   On March 16, 2020, a non-party RN performing rounds noted that Gardiner may continue using an ACE wrap bandage.   (*Id.*, PageID.720-721.)   On March 25, 2020, Gardiner attended

a scheduled medical visit with a non-party RN, who noted in the medical record that Gardiner had no impairment.   Gardiner turned in the ACE bandage and complained about having a top bunk.   (*Id.*, PageID.718-719.)   On June 26, 2020, Gardiner was seen by PA Westcomb for a review of his recent lab tests which were unremarkable. (*Id.*, PageID.714.)

On August 16, 2020, Gardiner was examined by RN Bergh, after he injured his knee while working in the yard.   (*Id.*, PageID.707-709.)   Gardiner stated that he injured his knee 8 years ago and reinjured it about 1 year earlier.   He said his tendon in his knee moves out of place and he experiences horrible pain.   (*Id.*)   RN Bergh instructed Gardiner to keep track of the number of times his knee displaced, to purchase pain medication from the prison store as needed and referred him to a medical provider.   (*Id.*)   On August 28, 2020, Gardiner was examined by medical provider PA Westcomb.   (*Id.*, PageID.705-706.)   Gardiner was given an ACE wrap, provided range of motion and strengthening exercises, an x-ray was scheduled, and he was advised to avoid activities that cause him pain.   (*Id.*)

PA Westcomb followed up with Gardiner on September 30, 2020.   (*Id.*, PageID.703-704.)   During the exam, PA Westcomb noted that an x-ray was currently unavailable, and that Gardiner reported that his knee was better.   (*Id.*)   PA Westcomb further noted that Gardiner should continue to use an ACE wrap and to do exercises, but to avoid activities that cause him pain.   (*Id.*)   PA Westcomb finally noted that a follow-up will be scheduled after Gardiner is able to get an x-ray.   (*Id.*)

On December 12, 2020, Gardiner injured his knee, causing it to pop out of place while he was doing jumping jacks in the yard.   (*Id*., PageID.701-702.)   Gardiner was evaluated by RN Wright.   RN Wright put him on the list to see the medical provider, encouraged him to rest, to use a warm/cold compress, and to take Ibuprofen as needed.   (*Id*.)

Gardiner was evaluated by medical provider PA Westcomb on December 14, 2020.   (ECF No. 138-2, PageID.698-700.)   Gardiner reported that he had intermittent problems with his right knee locking up.   Two days earlier his knee locked up for 3-4 hours after he was doing squats.   An x-ray or MRI has not been available due to COVID restrictions.   (*Id*., PageID.698.)   PA Westcomb noted that Gardiner sustained a knee injury with reduced range of motion and swelling.   PA Westcomb prescribed NSAID (nonsteroidal anti-inflammatory drug) capsules to be taken two times per day for 180 days and requested an x-ray for a possible meniscal injury.   (*Id*., PageID.699.)   PA Westcomb wrote:

> keep the knee wrapped at this point take NSAIDs for pain.   He was advised to stop activities that aggravate his pain.   Urgent X-ray requested off site and then I will consider requesting an MRI.   Probably meniscal injury.   MP f/u [follow up] pending X-ray result.

(*Id*., PageID.700.)

Gardiner received an x-ray the next day at the Munising Memorial Hospital. (*Id*., PageID.728.)   The x-ray was unremarkable.   (*Id*.)

PA Westcomb evaluated Gardiner's knee on January 28, 2021.   (*Id*., PageID.741-742.)   PA Westcomb informed Gardiner that the MRI request was denied with instructions for her to "[c]onsider implementing conservative

9

management based upon exam findings and recent history of injury.    MRI would likely only be necessary if surgery is being considered." (*Id.*, PageID.741.)    PA Westcomb provided a new ACE wrap, and instructed Gardiner to continue strengthening exercises, but to avoid activities that aggravate pain.    (*Id.*, PageID742.)

On March 4, 2021, Gardiner was examined by an RN for chronic issues with sporadic locking of his knee.    (*Id.*, PageID.738-737.)    The RN advised Gardiner that MRI decisions are made outside the facility and as long as no one witnesses his locked knee or that it would not go back into place, an MRI request is likely to be rejected. (*Id.*)    The RN spoke with PA Westcomb who agreed to write Gardiner a prescription for Tylenol.    (*Id.*)

On May 14, 2021, a non-party RN ordered a new ACE wrap.    (*Id.*, PageID.736.) On June 9, 2021, PA Westcomb prescribed and ordered a NSAID (Celecoxib) for Gardiner to take two times daily for pain.    (*Id.*, PageID.734.)    On July 12, 2021, and on September 18, 2021, RN Bergh ordered Gardiner new ACE wraps.    (*Id.*, PageID.733.)    Another non-party RN ordered a new ACE wrap on December 11, 2021.    (*Id.*, PageID.743.)

On September 14, 2022, Gardiner spoke with a non-party RN in his housing unit.    (*Id.*, PageID.754.)    Gardiner stated his right knee locks up for no reason and that he needed an MRI and surgery.    (*Id.*)    Gardiner was cautioned to not engage in extreme exercises, to use pain medication as directed, to continue gentle stretching,

a warm/cold compress, and an ACE wrap.  (*Id.*)  It was noted that Gardiner had a good supply of pain medication.  (*Id.*, PageID.755.)

On September 23, 2022, PA Westcomb examined Gardiner during a follow up appointment.  (*Id.*, PageID.751-753.) Gardiner reported intermittent locking of his knee and that he is unable to do high impact activities.  (*Id.*, PageID.751.)  PA Westcomb noted that an MRI was requested for a possible meniscus injury.  (*Id.*, PageID.753.)

On September 29, 2022, PA Westcomb gave Gardiner a corticosteroid injection and noted that the request for an MRI was still pending.  (*Id.*, PageID.748-750.) Gardiner was scheduled to have an MRI in November.  (*Id.*, PageID.747.)  The November 11, 2022 MRI revealed a complex meniscus tear in Gardiner's right knee. (*Id.*, PageID.746, 756-757.)  PA Westcomb examined Gardiner on November 29, 2022, and advised him that he was approved for an orthopedic surgical consultation. (*Id.*, PageID.743.)

On December 28, 2022, Gardiner was examined at the Advanced Center for Orthopedics and Plastic Surgery and formally diagnosed with a meniscus tear.  (*Id.*, PageID.761-762.)  On January 10, 2023, PA Westcomb noted that she had made a request for arthroscopic surgery for Gardiner.  (*Id.*, PageID.770.)  Gardiner visited healthcare on January 25, 2023, and was seen by a non-party RN who noted that he was approved for surgery and that he wanted a bottom bunk.  (*Id.*, PageID.769.) On February 17, 2023, PA Westcomb reviewed Gardiner's file and noted that he was scheduled for surgery and that there were no other changes to the treatment plan.

(*Id.*, PageID.767.)   Gardiner was examined on March 7, 2023, by PA Westcomb who noted that he was cleared for surgery and given a bottom bunk in anticipation of surgery.   (*Id.*, PageID.763-765.)   On March 21, 2023, Gardiner had surgery to repair his torn meniscus.   (*Id.*, PageID.758.)

### III.   Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV.   Eighth Amendment – Deliberate Indifference

Gardiner asserts that Defendants caused him to suffer needlessly in pain in violation of his Eighth Amendment rights by not immediately sending him to the hospital for diagnostic imaging and surgery.   An Eighth Amendment claim for the

12

deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *Phillips v. Roane Cnty.*, 534 F.3d 531, 539-40 (6th Cir. 2008). Where a prisoner challenges their treatment as inadequate, a prisoner must show more than a serious medical need.  *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021).  To establish the objective component in a situation where a prisoner asserts that the care received was inadequate, a prisoner must prove grossly inadequate care which generally requires the introduction of medical evidence typically in the form of expert testimony.  *Id.*

The subjective component of a deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  To prove a

13

defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

The subjective component was summarized in *Rhinehart*.   There, the court of appeals stated the following:

> [T]he plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness."   This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

### a.   RNs Wright, Bergh, and Bedient

First, Defendants Wright, Bergh, and Bedient argue that Gardiner cannot establish the objective component of his Eighth Amendment claim because he cannot present any evidence which could establish that the care he received from the RNs was so grossly inadequate that it amounted to something worse than medical

14

malpractice.    (ECF No.138, PageID.686.)    The RNs had limited contact with Gardiner.

Gardiner was first examined on August 16, 2020, by Defendant RN Bergh. Gardiner alleges that Defendant RN Bedient also examined him that day.   (ECF No. 146, PageID.1152-1154.)   RN Bergh noted on examination of Gardiner's knee that he had full range of motion, had ambulated to healthcare independently, and removed his overalls by stepping out of each pant leg without favoring his right knee.   (*Id.*, PageID.708.)   She assessed him with impaired comfort and a chronic right knee issue.   (*Id.*)   RN Bergh referred Gardiner to a medical provider and instructed him "to keep track of times knee displaced, keep appt w/provider.   Instructed to purchase any needed pain meds from store as this is on-going issue." (*Id.*)   Based on RN Bergh's referral, medical provider Defendant PA Westcomb examined Gardiner on August 28, 2020.   (*Id.*, PageID.705.)

Defendant RN Wright examined Gardiner on December 12, 2020, after he injured his knee doing jumping jacks in the prison yard.   (*Id.*, PageID.701-702.)   RN Wright listed him for follow up care with a medical provider, encouraged him to rest his knee, use warm and cold compress, and take Ibuprofen as needed.   (*Id.*, PageID.702.)   Based on RN Wright's referral, Gardiner was examined by medical provider Defendant PA Westcomb on December 14, 2020.   (*Id.*, PageID.699-700.)

In the opinion of the undersigned, Gardiner cannot show that RNs Bergh, Bedient, or Wright violated the objective component of an Eighth Amendment deliberate indifference claim because the care that they provided was not grossly

inadequate.  *Phillips*, 14 F.4th at 535.   RNs do not have the authority of doctors, PAs and NPs to order diagnostic testing such as x-rays and MRIs.   (ECF No. 138-3, PageID.772 (Bergh Affidavit); ECF No. 138-5, PageID.786 (Wright Affidavit).)   The RNs examined Gardiner and, based upon their examinations, they referred him to a medical provider, instructed him to use a cold and warm compress, and to take Ibuprofen for pain.   Gardiner has not provided expert testimony which could establish that the treatment he received by these RNs was grossly inadequate. *Phillips*, 14 F.4th at 535.

Second Defendants Wright, Bergh, and Bedient argue that Gardiner cannot establish the subjective component of his Eighth Amendment claim because he cannot show that Defendants' "intent was to inflict punishment."   (ECF No. 138, PageID.688.)   Defendant RN Bergh (and Gardiner says also Defendant RN Bedient) examined Gardiner when he injured his knee while working on August 16, 2020, and Defendant RN Wright examined Gardiner when he injured his knee doing jumping jacks on December 12, 2020.   RNs Bergh and Wright both stated that they did not believe that an ambulance was necessary to take Gardiner to the hospital at the time they examined him.   (ECF No. 138-3, PageID.772-773 (Bergh Affidavit); ECF No. 138-5, PageID.786-787 (Wright Affidavit).)   The RNs referred Gardiner to a medical provider, and he was then examined by PA Westcomb.   The RNs instructed Gardiner to rest his knee, use cold/warm compresses, and to take Ibuprofen as needed for pain. Gardiner alleges only his disagreement in manner of treatment that he received from the RNs and not that Defendants acted with criminal recklessness.   *Rhinehart*, 894

F.3d at 738.   Defendants RN Wright, Bergh, and Bedient have shown that no genuine issue of material fact exists and that they are entitled to summary judgment on Gardiner's Eighth Amendment claim.

### b.  PA Westcomb

Defendant PA Westcomb argues that Gardiner cannot establish the subjective component of his Eighth Amendment deliberate indifference claim.   PA Westcomb examined Gardiner for complaints that his right knee intermittently locked up.   On August 28, 2020, PA Westcomb assessed Gardiner with pain in the right knee.   PA Westcomb prescribed an ACE wrap, ordered a routine x-ray, provided range of motion and strengthening exercises, and told him to refrain from activities that aggravated his knee.   (ECF No. 138-2, 705-706; ECF No. 141-2, PageID.820 (Westcomb Affidavit).)   PA Westcomb followed up with Gardiner on September 30, 2020.   (ECF No. 138-2, PageID.703-704; ECF No. 141-2, PageID.820.)   PA Westcomb informed Gardiner that an x-ray was not available due to the COVID-19 pandemic.   The ACE wrap was helping so she instructed Gardiner to continue to use the ACE wrap, avoid activities that aggravated his knee, and to continue the knee exercises as previously instructed.   (*Id.*)

On December 14, 2020, PA Westcomb evaluated Gardiner after he complained that his knee locked in a flexed position for 3-4 hours after he was exercising.   (ECF No. 138-2, PageID.698-700; ECF No. 141, PageID.821.)   PA Westcomb prescribed NSAIDs, instructed him to keep his knee wrapped, and to stop activities that aggravate pain.   (*Id.*)   PA Westcomb requested an urgent off-site x-ray due to her

assessment of a possible meniscal injury.  (*Id*.)  The x-ray was approved by the Utilization Review Committee.  (*Id*.)  The x-ray imaging came back unremarkable. (ECF No. 138-2, PageID.728; ECF No. 141-2, PageID.821.)

On December 17, 2020, PA Westcomb requested a routine MRI due to her assessment of a possible meniscal tear.  (ECF No. 141-2, PageID.821.)  The Utilization Reviewer, a Corizon physician, denied the request in favor of conservative management of Gardiner's knee injury.  (*Id*.; ECF No.141-3, PageID.849.)  PA Westcomb examined Gardiner's knee on January 28, 2021, and informed him that her request for an MRI was denied and that conservative treatment was recommended by the Utilization Reviewer.  (ECF 138-2, PageID.741-742; ECF No. 141-2, PageID.821-822.)  PA Westcomb ordered a new ACE wrap, instructed him to continue knee strengthening exercises, to avoid activities that aggravate his pain, and to request follow up care with her as needed.  (*Id*.)  PA Westcomb continued the conservative management as recommended by the Utilization Reviewer physician.  (ECF No. 141-2, PageID.821-822.) Gardiner continued to receive ACE wraps, NSAIDs such as Tylenol and Celebrex, he was instructed to continue exercises to improve knee strength and range of motion, and to avoid activities that aggravate his knee symptoms.  (*Id*., PageID.822.)

PA Westcomb next examined Gardiner on September 23, 2022.  (ECF No. 138-2, PageID.751-753; ECF No. 141-2, PageID.823.)  At that time PA Westcomb made another request for an MRI because she believed that conservative management of Gardiner's knee did not resolve his symptoms.  (*Id*.)  On September 29, 2022, PA

Westcomb gave Gardiner a corticosteroid injection in his knee to alleviate pain. (ECF No.138-2, PageID.748-750; ECF No. 141-2, PageID.823.)  PA Westcomb informed Gardiner that the request for an MRI was still pending and to avoid activities that aggravated his knee.   This time, the MRI request was approved, and imaging showed a meniscal tear.   (ECF No. 138-2, PageID.747; ECF No. 141-2, PageID.823.) PA Westcomb made a request for an Orthopedic Surgical consultation which was approved, and surgery was recommended and approved.   (ECF No. 138-2, PageID.743, 769-770.)   Gardiner elected to have surgery, which was successfully performed on March 21, 2023.   (*Id*., PageID.758.)

In the opinion of the undersigned, no genuine issue of material fact exists on the issue of whether PA Westcomb had the subjective intent to deny Gardiner medical treatment in deliberate indifference to his serious medical needs.   The uncontroverted evidence establishes otherwise.   PA Westcomb provided appropriate treatment for Gardiner's complaints of knee pain.   She provided him with an ACE wrap, prescribed NSAIDs for pain, scheduled him for an x-ray as soon as she could due to the COVID-19 pandemic, and requested an MRI after the x-ray showed normal findings.   The MRI was denied through no fault of PA Westcomb and PA Westcomb was instructed by a doctor to provide conservative management of Gardiner's symptoms.   Once conservative management failed to resolve Gardiner's symptoms, PA Westcomb's request for an MRI was approved.   The MRI showed a meniscus tear in Gardiner right knee which was successfully repaired by surgery.   Gardiner has alleged nothing more than a difference of opinion with PA Westcomb's treatment of

19

his knee injury.   In the opinion of the undersigned, PA Westcomb is entitled to dismissal because she did not act with deliberate indifference to any of Gardiner's medical needs.

## V.   Qualified Immunity

Defendants Wright, Bergh, and Bedient argue that they are entitled to dismissal of the complaint against them based upon qualified immunity. Defendants' claim for qualified immunity is largely redundant.   Defendants argue that because they did not violate Plaintiff's constitutional rights they are entitled to qualified immunity.[1]   In any event, the undersigned agrees; because there are no genuine issues of material fact and it is the undersigned's opinion that Defendants did not act with deliberate indifference to Gardiner's serious medical needs, it is the undersigned's opinion that Defendants are entitled to qualified immunity in their individual capacities.   *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

## VI.   State Law Claims

Gardiner   has   arguably   raised   state   law   claims   such   as   medical

---

[1]    In other words, Defendants do not argue that the rights at issue were not clearly established.

malpractice/misdiagnosis claims in his complaint.    (ECF No. 1, PageID.16.)    Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States."   *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).    Plaintiff, however, seeks to invoke this Court's supplemental jurisdiction over state-law claims.    In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."   *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).    Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.   *Id.* Dismissal, however, remains "purely discretionary."   *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). It is respectfully recommended that the Court decline to exercise supplemental jurisdiction over the state law claims.

### VII.   Recommendation

Accordingly, it is respectfully recommended that the Court grant Defendants' motions for summary judgment and dismiss this case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C);

Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:    June 12, 2024                            /s/ *Maarten Vermaat*
                                                   MAARTEN VERMAAT
                                                   U.S. MAGISTRATE JUDGE